914 F.2d 247
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Jerry BELL, Plaintiff-Appellant,
v.
SECRETARY OF TRANSPORTATION, Defendant-Appellee.
 No. 89-1783.
 United States Court of Appeals, Fourth Circuit.
 Submitted March 23, 1990.
Decided Sept. 19, 1990.
As Amended Oct. 25, 1990.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Richard L. Williams, District Judge. (CA-88-1420-A)
 Joel P. Bennett, Joel P. Bennett, P.C., Washington, D.C., for appellant.
 Henry E. Hudson, United States Attorney, Dennis E. Szybala, Assistant United States Attorney, Alexandria, Va., for appellee.
 E.D.Va.
 AFFIRMED.
 Before PHILLIPS, SPROUSE and WILKINSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Jerry Bell appeals from a judgment dismissing his claims of race discrimination and reprisal and unwarranted adverse administrative action by his public employer, the Secretary of Transportation, in terminating his employment. We affirm the judgment.
 
 
 2
 * The facts, essentially as found by the district court after a bench trial, are as follows.
 
 
 3
 Jerry Bell is a black male. He was employed by the Federal Aviation Administration (FAA) from 1973 until his removal on June 10, 1988, at the Leesburg, Virginia, Air Traffic Control Center. At the time of his removal, Bell was a Central Computer Complex Electronics Technician, at the GS-12 level. In this position, he was responsible for maintaining the mainframe computers that provide data to the radar display terminals used by air traffic controllers. The position description and performance standards for Bell's position required that he be able to work alone, on shift arrangement, under stress, on equipment with high AC voltage, to perform moderate lifting up to fifty pounds, to push devices in excess of 200 pounds, and to work in a confined area. The Position Performance Standards also noted that "lack of physical stability could result in damage to the computer complex or physical harm to the individual."
 
 
 4
 Before his termination in 1988, Bell had been suspended from his position on two occasions: once in January 1985 for five days for insubordination, and once in January 1986 for sixty days for insubordination, failure to carry out his responsibilities, and absence from his assigned work area.
 
 
 5
 Bell challenged those suspensions in a civil action in federal district court claiming that they were the products of race discrimination and reprisal. The claims were dismissed on the merits in an unappealed decision. Bell v. Secretary of Transp., CA-86-0719-A (E.D.Va. Jan 15, 1987).
 
 
 6
 Following his 1986 suspension, Bell refused to acquiesce in the FAA's decision suspending him. A few days later, Bell sent his Sector Manager, Charles A. Gobs, a medical certificate from Dr. Peter G. Bernad stating that Bell was under his care for "neurological evaluation and treatment" and recommending that Bell be placed on sick leave from January 23 to February 3, 1986. The certificate did not mention the specific condition for which Bell was being evaluated and treated.
 
 
 7
 Gobs apparently took no action to investigate the medical certification and on March 31, 1986, proposed Bell's removal for insubordination. William Baxter, Gobs' successor as Sector Manager, later approved Bell's removal, not having been informed of the medical certificate of Dr. Bernad. Bell then challenged the removal in union arbitration proceedings.
 
 
 8
 At the arbitration hearing in October of 1986, Bell presented a written declaration from Dr. Bernad stating that Bell suffered from myasthenia gravis, which he described as an incurable, life-shortening disorder characterized by periodic attacks. He identified the major symptoms as blurred and double-vision, severe muscular weakness, difficulties in breathing and swallowing, and frequent gastro-intestinal symptoms akin to diarrhea. Dr. Bernad also stated that Bell had had attacks of myasthenia gravis two or three times a year over the years that he treated him and that these attacks lasted about a week. He further noted that Bell was treated on January 27 for an attack that Bell said began on January 23.
 
 
 9
 The arbitrator found that Bell's conduct on January 23, 1986, was largely due to his neurological condition while noting that "if identical conduct was indulged in by a normal employee, it would be considered insubordination." The arbitrator therefore rescinded the removal and directed the FAA to restore Bell to his position and to reimburse him for lost wages and benefits.
 
 
 10
 The FAA received notice of the arbitrator's decision in January 1987. Officials at the Airways Facilities Division for the Eastern Region then consulted with Dr. Edward C. Bauer, the Eastern Regional Flight Surgeon, and requested his advice as to whether Bell could perform his job safely in light of his medical condition and whether any accommodation might be needed in relation to his position. Dr. Bauer reviewed Dr. Bernad's statement and the performance standards and position description for Bell's position. Dr. Bauer determined that the information provided in Dr. Bernad's declaration was inadequate to make a decision as to Bell's medical condition.
 
 
 11
 Dr. Bauer then prepared a memorandum to Bell dated January 22, 1987, citing the need to obtain specific information regarding the history, physical findings, treatment, and prognosis for Bell's medical condition. Dr. Bauer also requested that Bell execute a release to enable the FAA to communicate directly with Bell's physician. This was forwarded to Bell's attorney by letter from the FAA's attorney dated January 30, 1987. That letter formally advised Bell that the FAA would not seek further review of the arbitrator's decision and, with regard to the medical release, stated that Bell could either present the release to his physician with a request that the information be sent to the FAA Regional Flight Surgeon or return the executed release to the Flight Surgeon so that the FAA could obtain the information directly.
 
 
 12
 Having received no response from Bell, Dr. Bauer prepared a second request to him dated February 27, 1987, noting that, without the information requested, Dr. Bauer was unable to make a determination of Bell's fitness for work. This request was forwarded directly to Bell by Baxter with a memorandum dated March 9, 1987, in which Baxter recommended that Bell provide the information Dr. Bauer needed.
 
 
 13
 On March 12, 1987, Hugh McGinley, Supervisor of the FAA Labor Relations Section, wrote to Bell, apparently in response to a telephone call in which Bell indicated that he had not received the previous correspondence. McGinley's letter again explained the need for medical information and requested that Bell promptly provide that information.
 
 
 14
 In a letter dated March 17, 1987, Bell responded to McGinley's March 12 letter. In that letter, Bell took the position that the request for medical information violated the union agreement by constituting a change in past practices regarding working conditions, a unilateral change in terms and conditions of employment, and a bypass of the exclusive bargaining representative. Bell included with this letter a statement from his doctor dated March 15, 1987. That statement read in its entirety: "I have reviewed Mr. Bells [sic] medical condition today, and recommend he be returned to duty status immediately."
 
 
 15
 On March 31, 1987, McGinley responded to Bell's March 17 letter. While noting that the March 16 medical certificate "would appear to be significantly less detailed than Dr. Bauer indicated that he would require," McGinley stated that he would forward it to Dr. Bauer to determine if it was sufficient. McGinley also explained, once again, the need for the medical information.
 
 
 16
 By memorandum to Bell dated April 7, 1987, Dr. Bauer stated that the March 26 statement from Dr. Bernad "obviously contains no medical data on which to base a determination of your ability to safely perform the duties of your position ..." and referred Bell to the prior request. Bell wrote back to Dr. Bauer on April 25, 1987, complaining that he had not been reinstated and concluding: "Since I am not a government employee, I request that you not send me any correspondence of a medical nature."
 
 
 17
 McGinley again wrote Bell on May 11, 1987. In relevant part that letter stated:
 
 
 18
 We are sure you realize that you are a government employee and are being paid by the FAA. Your complaints regarding missing paychecks would seem to acknowledge your recognition of that. Rather than waste time and effort making senseless arguments, your expressed concern about returning to duty will be much better served by your arranging for Dr. Bernad and any other hospital, clinic, treatment center, or medical practitioner, who treated you for myasthenia gravis in the past, to make your medical histories available to Dr. Bauer. Dr. Bauer believes he needs detailed medical information to determine whether you can resume your duties as an Electronics Technician maintaining the IBM 9020 NAS Computer System. Mr. Baxter, your Sector Manager, has been awaiting Dr. Bauer's determination. You should realize that a responsible manager cannot allow you to sit at home at full pay indefinitely if you are not making any effort to cooperate with Dr. Bauer. Your cooperation is essential at this point for your present situation to be resolved amicably. The FAA would like to return you to duty, with whatever limitation may be required, and gain useful, productive service from you. There is nothing pleasurable, healthy or efficient about constant conflict and strife and we would much prefer a return to the relationship you had with the FAA earlier in your career.
 
 
 19
 Presumably in response to McGinley's exhortation and plea for cooperation, Bell wrote to Dr. Bauer stating, in part, that "my medical problem will not cause a [sic] administrative difficulty. If it ever does, I am sure the agency will accommodate me...." He also stated that the October 30, 1986, declaration from Dr. Bernad should have provided all the information that the FAA needed to make its determination and reiterated his position that the FAA had no authority to seek this information in the first place. He also enclosed a new "statement" from Dr. Bernad which merely reiterated that Bell had myasthenia gravis, identified two medications he was taking, and stated that he had no working limitations.
 
 
 20
 On or about June 1, 1987, Dr. Bauer noted in a memorandum to McGinley that the latest statement from Dr. Bernad "continues to restate information we already have" and was inadequate to allow a determination to be made. The memorandum also contained the handwritten notation of Dr. Bauer reflecting a telephone conversation with Dr. Bernad in which Bernad stated that Bell advised him "not to release any medical information."
 
 
 21
 Frustrated by Bell's uncooperative attitude towards providing adequate medical information, the FAA arranged for an independent medical examination. On July 20, 1987, Dr. Bauer confirmed arrangements scheduling an August 17, 1987 examination of Bell by Dr. Kenneth Moss. Dr. Moss had been recommended to Dr. Bauer by Dr. Bernad, who shared his practice with Dr. Moss. Dr. Bauer wrote Bell that same day advising that he had an appointment with Dr. Moss on August 17, 1987, at 11:00 a.m. The letter also stated: "Should there be any extenuating factors, or circumstances that could prevent you from keeping this appointment, you will be expected to contact Dr. Moss, Mr. Billy Baxter and this office."
 
 
 22
 Bell failed to appear for the August 17, 1987, examination. Baxter's office was advised of this in a telephone call from Dr. Moss' office on that afternoon. Neither Dr. Bauer, Dr. Moss, nor Mr. Baxter received any communication from Bell before or on the 17th to explain why he did not appear for the appointment.
 
 
 23
 Later, at trial, Bell testified that on August 18, the day after the scheduled appointment, he had telephoned the FAA's Regional Office in New York, and had then explained to a Ms. Annette Baldwin, a personnel specialist, that he had missed the appointment because of car trouble. Sometime after August 22, 1987, Ms. Baldwin received two letters from Bell: one addressed to William Baxter, dated August 18, 1987, and one addressed to Dr. Bauer, dated August 14, 1987. Both letters, however, reflected the same certified mail receipt number and both were received in the same envelope bearing a postmark of August 22, 1988.
 
 
 24
 In the letter addressed to Dr. Bauer, Bell acknowledged receipt, on July 25, of Dr. Bauer's July 20 letter and accused Dr. Bauer of intentionally overstepping his authority in directing Bell to appear for the medical examination. The letter complained of the FAA's attempts to secure medical information and continued: "Not only do you not have the authority to order me but your request is contrary to law (5 U.S.C. Section 339) in that the position I have held has never had only physical/medical standards for selection or retention." The letter concluded by advising Dr. Bauer of the unfair labor practice charges Bell had filed based on Dr. Bauer's allegedly improper order. Although it appeared to have been written three days before the scheduled examination, the letter did not indicate that Bell then planned to attend the examination.
 
 
 25
 In the letter to Baxter, Bell again complained of an apparent dispute as to his back pay. With respect to the August 17, 1987, medical examination, Bell reiterated his position that Dr. Bauer had no authority to direct him to attend that examination, but went on to state that although he was contesting the legality of the order, he had decided to keep the appointment and was attempting to do so when his car broke down.
 
 
 26
 On September 30, 1987, Baxter proposed by letter to remove Bell for his failure to carry out the order to attend the August 17 examination and for being absent without leave on that day. The proposed removal noted that Bell had, over the past several months, resisted all attempts by the FAA to secure medical information concerning his condition. It is noted the prior suspensions in 1985 and 1986 and found that the charged offenses were consistent with a pattern of insubordination. Baxter acknowledged receipt of Bell's letter dated August 18, but noted that it was not mailed until August 22 and did not explain why he failed to call. The letter also stated that: "I will also give very strong and positive consideration if, in your reply to this proposal, you indicate your willingness to now report for medical examination."
 
 
 27
 In a responsive letter to Baxter dated October 5, 1987, Bell's attorney proposed that the removal be held in abeyance and that another examination be scheduled. Baxter noted his agreement to this proposal in a letter dated October 8, 1987. By memo to McGinley that same date, Baxter requested that steps be taken to reschedule the medical examination.
 
 
 28
 In a letter dated October 18, 1987, to Bell's attorney, Baxter responded to a number of points raised in Bell's August 18 letter. Among other things, Baxter offered to arrange for a travel advance to Bell and again explained the authority for the medical examination.
 
 
 29
 By letter dated October 23, 1987, Bell was advised that the medical examination had been rescheduled with Dr. Moss for November 16, 1987.
 
 
 30
 Bell did attend the November 16, 1987, examination. However, when Dr. Moss asked Bell about the history of his illness, Bell was uncooperative. Dr. Moss had not reviewed Bell's medical records before the November 16 examination. During December, Dr. Moss took Bell's records with him to a medical conference in Boston, intending to review them, but he did not find time to do so. Upon his return from the conference, Dr. Moss was told by the medical records custodian that Bell had advised her that Dr. Moss did not have permission to review Bell's prior treatment records. Because of this, Dr. Moss did not ever review Bell's records.
 
 
 31
 On December 12, 1987, Bell sent a letter to the medical records custodian expressly stating that he considered Dr. Moss to be "an agent of the FAA and as such [that Dr. Moss] did not have [his] permission to review [his] medical files." The letter concluded with a statement that Dr. Moss and the custodian "will be held accountable."
 
 
 32
 On December 15, 1987, Dr. Moss prepared a report to Dr. Bauer concerning the November 16, 1987, examination of Bell. The report noted that Dr. Moss had reviewed the declaration of Dr. Bernad, but had been refused permission to review Bell's medical records. After presenting the detailed results of the examination, Dr. Moss stated that he failed to find any problem that would preclude Bell from performing his job, but he also stated:
 
 
 33
 the patient has refused that any information from his charts prior to my evaluation be released to the FAA, and I have not and will not examine the materials contained in this voluminous record. Furthermore, the patient's attitude, particularly initially during examination, was hostile and his information was guarded; therefore, the full character of his history is of uncertain character. For this reason, I find that a definite statement for fitness for duty is especially difficult, and am unable to provide a definite and unequivocable statement as to his abilities to perform his job.
 
 
 34
 Although Moss' report was prepared on December 15, 1987, he did not send the report to Dr. Bauer at that time. Dr. Moss' reason for declining to send the report was Bell's implicit threat to sue if any information was released to the FAA.
 
 
 35
 On December 28, 1987, Dr. Bauer received a call from Baxter requesting the results of the November examination of Bell. Not having received any report, Dr. Bauer called Dr. Moss and was advised that, while Bell did appear for the examination, he had refused to allow any information to be released to the FAA. Dr. Bauer thereupon requested Dr. Moss to provide a letter stating that he would be unable to provide the results of the examination of Bell. Dr. Moss did so by letter dated January 7, 1988, stating that: "Mr. Bell has refused to allow us to release to you the results of the examination."
 
 
 36
 Sometime during February 1988, Bell did execute a release permitting the medical records custodian to forward Dr. Moss' report to Dr. Bauer. Dr. Bauer received that report in April 1988. Upon considering the report, Dr. Bauer concluded that it was inadequate to allow him to make a determination of whether Bell could safely perform his job. His reasons, as set forth in his memo to McGinley dated May 5, 1988, were the inconclusive nature of Dr. Moss' evaluation balanced against Dr. Bernad's statement of the frequency and acuteness of the attacks Bell had suffered in the past.
 
 
 37
 On April 1, 1988, by letter to Mr. Bell, Mr. Baxter proposed to resume the removal action. In a written reply to the proposed removal, Bell's attorney stated that Dr. Moss' fears of discussing the evaluation with Dr. Bauer were unwarranted and not caused by any improper conduct by Bell.
 
 
 38
 A meeting to consider the proposed removal was held on May 12, 1988. Bell and his attorney attended. Bell's attorney proposed, as a resolution to the continuing dispute over the release of medical information, that Dr. Bauer prepare written questions to Dr. Bernad and send copies to Bell and his attorney. He indicated that Bell would then authorize Dr. Bernad to answer the questions if Bell found them reasonable and relevant. Bell's attorney reiterated this proposal in a letter to Baxter dated May 13, 1988. McGinley discussed this proposal with Dr. Bauer who deemed it unacceptable. Baxter so advised Bell's attorney by letter dated May 19, 1988.
 
 
 39
 Baxter issued a decision letter on June 3, 1988, removing Bell effective June 10, 1988, for failing to carry out orders and for unauthorized absence on August 17, 1987. Baxter considered the reasons offered by Bell, specifically his claim that he had had car trouble on August 17, but found that Bell offered no explanation for his failure to contact the FAA on that day. He also considered Bell's subsequent actions preventing the FAA from obtaining the needed medical information and found "that there is sufficient evidence to conclude that your action on August 17, 1987 was a deliberate act of misconduct and that removal is warranted."
 
 
 40
 Bell administratively appealed his removal to the Merit Systems Protection Board (MSPB), which held a hearing on August 19, 1988. In a decision dated October 4, 1988, the Administrative Law Judge (ALJ) upheld the removal.
 
 
 41
 Bell then brought this action alleging Title VII claims of race discrimination and reprisal, and an unwarranted adverse employment action by his federal employer in terminating his employment.[1]
 
 
 42
 The district court, finding the facts essentially as above summarized, concluded that Bell had failed to prove either his discrimination or reprisal claims under Title VII, and that the rejection of his administrative claim was supported by substantial evidence and was otherwise in accordance with law.
 
 
 43
 This appeal followed.
 
 II
 
 44
 In rejecting Bell's Title VII discrimination claim, the court analyzed the evidence under the familiar proof scheme of Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). Doing so, the court concluded that Bell had failed to carry his ultimate burden of proving that his removal was racially discriminatory. Simply put, he had failed to prove the essential fact that in removing him his employer treated him differently from any white employee similarly situated. His only evidence related to a white employee's removal was that of a fellow employee whose physical disability had been accommodated by the FAA. But that employee was by no means similarly situated to Bell in the respects here critical. Without regard to the nature of his physical disability and whether it was sufficiently similar to Bell's to make a comparison relevant, it was undisputed that the white fellow employee had freely submitted all requested medical information to the FAA and had offered repeatedly to submit to physical examination. Bell's failure to do so was of course a critical factor relied upon by the FAA as a legitimate, non-discriminatory reason for Bell's termination. The district court therefore properly concluded that on the critical, ultimate issue of the employer's motive in removing him, Bell had utterly failed to prove that the purpose was discriminatory.[2]
 
 
 45
 Turning to the reprisal claim, the court properly analyzed it as well under the Burdine proof scheme as adapted to the reprisal context. See Ross v. Communication Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985). As adapted, the essential elements of the claim are that (1) the employee engaged in protected activity; (2) the employer took adverse employment action against him; and (3) the adverse action was caused by the protected activity. Id.
 
 
 46
 The court properly concluded that Bell had proved the first two elements, but that he had failed to prove that the motive behind his removal was reprisal rather than the legitimate reason advanced by the FAA. This is a dispositive finding of fact that is not clearly erroneous. Given the undisputed evidence of Bell's continued history of intractability, insubordination, and outright defiance of reasonable requests for cooperation by his employer, the plausibility of the FAA's proffered reason for his removal is manifest, as is the district court's acceptance of the reason.
 
 
 47
 Turning finally to Bell's challenge to the administrative rejection of his "unwarranted adverse action" grievance, the district court concluded that the administrative determination was supported by substantial evidence, and that the sanction imposed was not an abuse of discretion. We agree with that conclusion. The agency had before it essentially the same evidence of Bell's intransigent conduct, including his refusal to obey a direct order of a superior, that was before the district court on the Title VII claim. This was substantial evidence of the warrant for the FAA's action.
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 This constituted a so-called "mixed-case," in which the district court determines the discrimination and reprisal claim in the first instance, and reviews the adverse action claim on the administrative record. See Hayes v. United States Gov't Printing Office, 684 F.2d 137 (D.C.Cir.1982)
 Bell also alleged a claim of handicap discrimination, but this was abandoned in the course of the action.
 
 
 [2]
 The district court actually analyzed the evidence as demonstrating that Bell had failed to prove one of the elements of his prima facie case by failing to prove that any white employee similarly situated was treated differently, but that alternatively, he had failed to prove that the legitimate non-discriminatory reason advanced by the FAA was pretextual. This analysis led to the right result, but where, as here, all the evidence was in, the court might simply have addressed the sufficiency of the evidence, considered in its entirety, to carry the plaintiff's burden of proving the ultimate issue, that the FAA removed him for racially discriminatory reasons. See United States Postal Serv. Bd. of Governors v. Aiken, 460 U.S. 711, 715 (1983). The result, as indicated in text, would be the same